**FILED**

FEB 22 2019

CLERK U.S. DISTRICT COURT
WEST. DIST. OF PENNSYLVANIA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| |
|---|
| UNITED STATES OF AMERICA and THE STATE OF NEW YORK and THE COMMONWEALTH OF MASSACHUSETTS *ex rel.* [UNDER SEAL] |
| Relators, |
| v. |
| [UNDER SEAL] |
| Defendants. |

Civil Action No. **19-190**

**COMPLAINT FOR VIOLATION OF THE FALSE CLAIMS ACT 31 U.S.C. §§ 3729 et seq.**

**FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. §§ 3730(b)(2)**

**JURY TRIAL DEMANDED**

**DOCUMENT TO BE KEPT UNDER SEAL
DO NOT ENTER ON PACER**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA and THE STATE OF NEW YORK and THE COMMONWEALTH OF MASSACHUSETTS *ex rel.* EDWARD J. KRESS, and THE INTERNATIONAL UNION OF PAINTERS AND ALLIED TRADES DISTRICT COUNCIL 57,<br><br>      Relators,<br><br>v.<br><br>SOUTHERN ROAD AND BRIDGE, LLC; and BRAYMAN CONSTRUCTION CORP.<br><br>      Defendants. | Civil Action No.<br><br>COMPLAINT FOR VIOLATION OF THE FALSE CLAIMS ACT 31 U.S.C. §§ 3729 et seq.<br><br><br>FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. §§ 3730(b)(2)<br><br>JURY TRIAL DEMANDED |

## FALSE CLAIMS ACT COMPLAINT

Edward J. Kress ("Kress") and the International Union of Painters and Allied Trades District Council 57 ("IUPAT57") (collectively "Relators") on behalf of themselves and the United States of America, the State of New York and the Commonwealth of Massachusetts bring this action under the federal False Claims Act, 31 U.S.C. §§ 3729-3732, the New York State False Claims Act, Article XIII of NYS Finance Law and the Massachusetts False Claims Act, Chapter 12 §§ 5A – 5O, to recover all damages, penalties and other remedies available under these Acts.

## INTRODUCTION

1.     Relators bring this action on behalf of the United States of America, the State of New York and the Commonwealth of Massachusetts against Defendants for treble damages and civil penalties arising from Defendants' false statements and false claims in

violation of the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.* (the "FCA"), the New York State False Claims Act (the "NYSFCA"), Article XIII of NYS Finance Law and the Massachusetts False Claims Act (the "MFCA"), Chapter 12 §§ 5A – 5O.

2.      Defendants engaged in a scheme to underbid their competitors to improperly win the 7th Street Andy Warhol Bridge Rehabilitation Project in Allegheny County, Pennsylvania. This scheme included misclassifying and under paying workers, hiring undocumented aliens not authorized to work in the United States, violating various health and safety laws designed to protect workers and the community, and otherwise cutting corners to save costs, resulting in defective workmanship, a waste of taxpayer money, and false claims for payment on the subject federally funded bridge rehabilitation project.

3.      The schemes and conduct of the Defendants caused public health and safety hazards, worker safety hazards, environmental pollution and, a bridge rehabilitation job that did not meet the quality standards called for by the contract and paid for by the local, state and federal governments.

4.      Defendant SRB has been engaged in bridge painting projects in numerous states under various government contracts in Massachusetts, New York, and other states.

5.      Defendant SRB has engaged in the same improper conduct to fraudulently obtain government contracts in these other jurisdictions and to maximize its profits at the expense of taxpayers.

6.      Defendants knowingly submitted and/or caused to be submitted false or fraudulent claims for payment from these federally and state funded construction projects, in violation of the False Claims Act (FCA), 31 U.S.C. 3729, et seq., New York State False

Claims Act, Article XIII of NYS Finance Law and the Massachusetts False Claims Act, Chapter 12 §§ 5A – 5O.

7. Relators seek, through this action, to recover treble damages and civil penalties arising from the false or fraudulent records, statements and/or claims that Defendants knowingly made or caused to be made in connection with their fraudulent scheme.

## JURISDICTION AND VENUE

8. This action arises under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* This Court has jurisdiction over this case pursuant to 31 U.S.C. §§ 3732(a) and 3730(b). This Court also has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1345.

9. Venue is proper in the Western District of Pennsylvania pursuant to 31 U.S.C. § 3732(a) because acts proscribed by 31 U.S.C. §§ 3729 *et seq.* and complained of herein took place in this district, and venue is also proper pursuant to 28 U.S.C. § 1391(b) and (c), because at all times material and relevant, Defendants transacted business in this District.

10. Although it is no longer jurisdictional, the public disclosure bar of the federal False Claims Act does not bar this suit. The Relators' complaint is not based upon allegations or transactions of fraud that have been publicly disclosed within the meaning of the False Claims Act. Even if the allegations or transactions of fraud had been publicly disclosed, the Relators would qualify as an "original source" of the information within the meaning of the FCA. Relators' information is based upon personal observations and investigation, independent of any relevant public disclosure and materially adds to any information that could have been publicly disclosed. Relators, moreover, voluntarily

provided the information upon which this action is based to the United States government before filing this case.

## THE PARTIES

11.     Edward J. Kress is an adult citizen of the United States who resides in Pennsylvania.

12.     The International Union of Painters and Allied Trades District Council 57 ("IUPAT57") is an unincorporated association, representing individuals in the construction industry and related activities, and is a labor organization as defined in 29 U.S.C. § 152(5).  IUPAT57 is headquartered at 101 Ewing Road, Carnegie, Pennsylvania, 15106.

13.     Defendant Southern Road and Bridge, LLC ("SRB") is a Florida limited liability corporation located at 715 Wesley Avenue, Tarpon Springs, Florida 34689.

14.     Defendant Brayman Construction Corporation ("Brayman") is a Pennsylvania corporation with its principal office in Saxonburg, Pennsylvania at 1000 John Roebling Way, Saxonburg, Pennsylvania 16056.

## THE FEDERAL FALSE CLAIMS ACT

15.     The False Claims Act was originally enacted during the Civil War. Congress substantially amended the Act in 1986—and, again, in 2009 and 2010—to enhance the ability of the United States Government to recover losses sustained as a result of fraud against it.  The Act was amended after Congress found that fraud in federal programs was pervasive and that the Act, which Congress characterized as the primary tool for combating fraud on the Government, needed modernization.  Congress intended

that the amendments would create incentives for individuals with knowledge of fraud against the Government to disclose the information without fear of reprisals or Government inaction, and to encourage the private bar to commit legal resources to prosecuting fraud on the Government's behalf.

16.     The FCA prohibits, *inter alia*: (a) knowingly presenting (or causing to be presented) to the federal government a false or fraudulent claim for payment or approval; (b) knowingly making or using, or causing to be made or used, a false or fraudulent record or statement material to a false or fraudulent claim; and (c) knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government.  31 U.S.C. §§ 3729(a)(1)(A)–(B), and (G).

17.     Any person who violates the FCA is liable for three times the amount of the damages sustained by the United States.  31 U.S.C. § 3729(a)(1).  In addition, he or she is liable for a civil penalty of up to $21,563 for each violation that occurred on or after November 2, 2015, or $11,000 for each violation that occurred prior to November 2, 2015. *Id.*

18.     The FCA allows any person having information about an FCA violation to bring an action on behalf of the United States, and to share in any recovery.  The FCA requires that the Complaint be filed under seal for a minimum of 60 days (without service on the Defendants during that time) to allow the government the opportunity to conduct its own investigation and to determine whether to join the suit.

**The Massachusetts False Claims Act (MFCA)**

6

19.    The Massachusetts FCA prohibits, *inter alia*: (a) knowingly presenting (or causing to be presented) a false or fraudulent claim for payment or approval; (b) knowingly making or using, or causing to be made or used, a false or fraudulent record or statement material to a false or fraudulent claim; (c) knowingly making, using or causing to be made or used a false record or statement material to an obligation to pay or to transmit money or property to the commonwealth or a political subdivision thereof; (d) entering into an agreement, contract or understanding with an official of the commonwealth or a political subdivision thereof knowing the information contained therein is false, or (e) knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government. Title II, Ch.12 § 5B.

20.    Any person who violates the Massachusetts FCA shall be liable to the commonwealth or political subdivision for a civil penalty of not less than $5,500 and not more than $11,000 per violation, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. No. 101-410 section 5, 104 Stat. 891, note following 28 U.S.C. section 2461, plus 3 times the amount of damages, including consequential damages, that the commonwealth or a political subdivision thereof sustains because of such violation. A person violating sections 5B to 5O, inclusive, shall also be liable to the commonwealth or a political subdivision thereof for the expenses of the civil action brought to recover any such penalty or damages including, without limitation, reasonable attorneys' fees, reasonable expert fees and the costs of investigation, as set forth below. Costs recoverable under said sections 5B to 5O, inclusive, shall also include the costs of

7

any review or investigation undertaken by the attorney general, or by the state auditor or the inspector general in cooperation with the attorney general. Id.

21.      The Massachusetts FCA allows any person having information about an FCA violation to bring an action on behalf of the Commonwealth, and to share in any recovery.  The Massachusetts FCA requires that the Complaint be filed under seal for a minimum of 120 days (without service on the Defendants during that time) to allow the Attorney General the opportunity to conduct its own investigation and to determine whether to join the suit. Id. at § 5C.

**The New York State False Claims Act (NYSFCA)**

22.      The New York State FCA prohibits, *inter alia*: (a) knowingly presenting (or causing to be presented) to the federal government a false or fraudulent claim for payment or approval; (b) knowingly making or using, or causing to be made or used, a false or fraudulent record or statement material to a false or fraudulent claim; and (c) knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or (d) knowingly concealing or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government.  New York State Finance Law, Article XIII § 189 (a)-(h).

23.      Any person who violates the New York FCA shall be liable to the state or a local government, as applicable, for a civil penalty of not less than six thousand dollars and not more than twelve thousand dollars, plus three times the amount of all damages, including consequential damages, which the state or local government sustains because of the act of that person. Id. at § 189(h).

8

24.     The New York State FCA allows any person having information about an FCA violation to bring an action on behalf of State, and to share in any recovery. The New York State FCA requires that the Complaint be filed under seal for a minimum of 60 days (without service on the Defendants during that time) to allow the Attorney General the opportunity to conduct its own investigation and to determine whether to join the suit. Id. at § 190(2).

## THE DAVIS BACON ACT

### Prevailing Wage Requirements

25.     The payment of "Prevailing Wage" is required by the Davis Bacon and Related Acts ("Davis Bacon" or "Davis Bacon Act"), 40 U.S.C. §§ 3141-3148, to be included in all contracts with contractors and subcontractors performing work on Federal or District of Columbia construction contracts or federally assisted contracts in excess of $2,000. The contractors must pay their workers not less than the Prevailing Wage rates and fringe benefits for corresponding classes of workers employed on similar projects in the area. Contractors must pay these wages and benefits without deduction and without exceptions. 40 U.S.C. § 3142.

26.     Defendant Brayman was the prime contractor on the 7th Street Andy Warhol Bridge Rehabilitation Project, a government construction contract that was funded in large part by United States Department of Transportation, Federal Highway Administration. Pursuant to contract, and state and federal law, Brayman and its subcontractor, SRB, were explicitly required to comply with the Prevailing Wage requirements of Davis Bacon.

27.    The Prevailing Wages and fringe benefits (collectively "wages") an employer must pay under Davis Bacon are determined in two steps: first, the employer must ascertain an employee's proper job classification; second, the employer must ascertain the Prevailing Wage rate for that job classification. By matching the rate to the classification, the appropriate wage is determined. The Prevailing Wage rates and fringe benefits are set by the Government and are included in covered contracts. 48 C.F.R. § 52.222-6. Contractors are aware of the Prevailing Wage and their obligation to comply.

28.    The wage determination and a Davis Bacon poster (WH-1321) must be posted at all times by the contractor and its subcontractors at the site of the work in a prominent and accessible place where it can be easily seen. 29 C.F.R. §5.5(a)(1).

29.    Federal contracting agencies have day-to-day responsibility for administration and enforcement of the Davis Bacon labor standards provisions in covered contracts for which they are responsible or to which they provide federal assistance under laws they administer.

**Certification**

30.    The contractor and any subcontractor must certify in writing to the Government that they are providing correct and complete payroll information that identifies all laborers at the contract worksite and that all such laborers are paid the Prevailing Wages. 40 U.S.C. § 3145; 29 C.F.R. § 5.5(a)(3)(i) & (ii) (A)-(B). These documents are known as payroll certifications.

31.    At least weekly, the contractors must certify to the Government payments of the applicable Prevailing Wage to all employees working under the contracts. 48 C.F.R. § 52.222-8.

32.     Prime contractors are required to insert the same language regarding payment of Davis Bacon Act mandated wages and certification of payroll in subcontractor contracts. 48 C.F.R. § 52.222-1. The subcontractor must acknowledge by signature that these clauses are incorporated in its contract. This acknowledgement is given to the Government. 48 C.F.R. § 52.222-11(d).

33.     The falsification of any of the above certifications can be subject to the contractor or subcontractor to civil prosecution under the False Claims Act. 29 C.F.R. §5.5(a)(3)(ii)(D).

**Materiality of Prevailing Wage Contract Provisions**

34.     The Prevailing Wage and benefit requirements are material terms of the Defendants' construction contract with the Government.

35.     Davis Bacon's legislative history illustrates the materiality of the Prevailing Wage requirement to the Government's construction projects. Then-Congressman Fiorello H. LaGuardia remarks on the House floor, "this bill is for the benefit of the government and workers" since, he argued, the workmanship from non-Prevailing Wage workers was "of course very inferior" to the workmanship of a Prevailing Wage worker. 74 Cong. Rec. 6510 (Remarks of Mr. LaGuardia). President Herbert Hoover, in a letter to his Secretary of the Treasury, made the identical point that requiring contractors to pay the Prevailing Wage ensures that they "employ the best type of American mechanics and laborers on Federal work." 74 Cong. Rec. 6506; see also *id.* At 6512 (Remarks of Mr. Cochran stating that Davis Bacon safeguards against "cheap labor, inferior labor," and that Davis Bacon's enactment "means much to the Government, as it will result in the employment of the best class of mechanics in the construction of

public buildings." Paying Prevailing Wages also "enable[s] the Government to get better returns for its money in higher efficiency and greater skill." *Id.* At 1931 (Remarks of Mr. Briggs.)

36.    A D.C. Circuit case further explains how the economic climate that led to Davis Bacon's enactment makes Prevailing Wage requirements a material part of government funded contracts:

> The Davis-Bacon Act was enacted during the Great Depression to ensure that workers on federal construction projects would be paid the wages prevailing in the area of construction. The evil sought to be remedied was that, with the precise specifications set out in federal contracts and the increasing standardization of building-material prices, the low-bidding contractor on a federal job was generally the one who paid the lowest wages. ... The contractor would accomplish this by taking advantage of widespread unemployment in the construction industry and hiring workers at substandard wages, often bringing a low-paid crew in from distant areas

*Building & Construction Trades v. Donovan,* 712 F.2d 611, 613-14 (D.C. Cir. 1983). The "most important" problem with this practice was that "it tended to undercut one of the purposes of the massive federal building program of the times, which was to distribute employment and federal money equally throughout the country." *Id.* At 614.

37.    Having work performed by workers paid Prevailing Wages is fundamental part of the contract that government agencies bargain for and expect to receive. *United States v. Novak,* 443 F.3d 150, 159 (2d Cir. 2006) (finding "intent to harm" element of fraud crime met where defendant's compliance with the law was a fundamental part of the contract bargain between the parties.)

38.    As manifested by the contracts at issue here, the government's interest in compliance with the Prevailing Wage laws is proprietary. "Under elemental principles of contract law, how more fundamental to the bargain can a contract provision be than one

which the parties agree that, if breached, conveys to the non-breaching party the right to terminate the contract and holds the breaching party liable for cover?" *United States v. Coren,* 2009 WL 257960 at *2 (E.D.N.Y. Aug. 20, 2009).

39.   As the prime contractor and as the party who signed the contract with the government, Brayman had a non-delegable duty to be sure that all workers under the contracts were paid the Prevailing Wages and fringe benefits in accordance with the contracts and Federal law. Defendants are fully responsible for the acts of their subcontractors.

## THE IMMIGRATION REFORM AND CONTROL ACT ("IRCA")

40.   The Congress of the United States saw fit in 1986, with the passage of the Immigration Reform and Control Act of 1986 ("IRCA"), to make *employment* of undocumented workers or illegal aliens a federal crime. *See,* § 101(a)(1), 100 Stat. 3360, 8 U.S.C. § 1324(a).

41.   Since that time, the United States Supreme Court has recognized and upheld the IRCA, noting that "IRCA 'forcefully' made combating the employment of illegal aliens central to '[t]he policy of immigration 'law." *See, Hoffman Plastics Compounds, Inc. v. National Labor Relations Board,* 535 U.S. 137, 122 S.Ct 1275 (2002).

### IRCA Requirements

42.   In general, "for an alien to be 'authorized to work in the United States, he or she must possess 'a valid social security account number card,' or other documentation evidencing authorization of employment in the United States..." *See, for example, e.g., Hoffman Plastics,* 535 U.S. at 147, 122 S. Ct at 1282 (note 3).

43.     The 1986 IRCA also mandated the use of a comprehensive "Employment Verification System" in order to require employers to verify an employee's 'lawful citizenship or lawful presence' in this country.  *See*, § 1324a(b).

44.     Violation of the IRCA subjects employers to civil fines and criminal prosecution.

**Certification**

45.     Employers certify compliance with the IRCA with the completion, signing and submission of a Form I-9, "Employment Eligibility Verification" form.

46.     By signing the I-9 form employers explicitly certify "under penalty of perjury, that to the best of my knowledge, this employee is eligible to work in the United States.... the document(s) [] examined appear to be genuine and relate to the individual."


**Materiality of IRCA Employment Verification Provisions**

47.     As recognized by the Supreme Court, Congress has left no doubt regarding the materiality of IRCA compliance and the statute's central role in combating the employment of illegal aliens. It did so by establishing an extensive "employment verification system." Further, the Court found that the employment verification system was critical to the "IRCA regime," and that to enforce it, it was necessary for employers to verify the identity and eligibility of all new hires by examining specific documents before they begin to work. Without this documentation, an unauthorized alien cannot be hired. *Hoffman Plastics*, 535 U.S. at 148, 122 S.Ct at 1282.

48.     Moreover, violations of IRCA are punishable by civil fines and may subject an employer to criminal prosecution.

14

49.     Under Federal law, Allegheny County would not have been permitted to enter into the contract had it known that Defendant Brayman or any of its subcontractors were hiring undocumented workers, illegal aliens or were otherwise violating federal employment laws.

50.     The Pennsylvania Department of Transportation and the United States Department of Transportation would not have approved or otherwise allowed disbursement of federal funds had they known that Defendant Brayman or any of its subcontractors were hiring undocumented workers, illegal aliens or were otherwise violating federal employment laws.

## HEALTH AND SAFETY LAWS, REGULATIONS AND CONTRACT REQUIREMENTS

51.     As more fully explained below, the following health and safety laws, regulations and contract requirements are applicable to the allegations herein.

### OSHA Requirements

52.     29 CFR 1910.134 - Respirator Protection.   When hazardous materials (such as lead paint dust) are involved, the employer must provide respirators at no cost to the employee and have a policy and procedure to require their use.

53.     29 CFR 1926.453 - Aerial Lifts. Employees shall always stand firmly on the floor of the basket, and shall not sit or climb on the edge of the basket or use planks, ladders, or other devices for a work position.  Belting off to an adjacent pole, structure, or equipment while working from an aerial lift shall not be permitted.

54.     29 CFR 1926.501 – Fall protection. Each employee on a walking/working surface (horizontal and vertical surface) with an unprotected side or edge which is 6 feet

(1.8 m) or more above a lower level shall be protected from falling by the use of guardrail systems, safety net systems, or personal fall arrest systems.

**Contractual Requirements Incorporating Local, State and Federal Laws**

55.    The Contract for the 7th Street Andy Warhol Bridge Rehabilitation Project incorporated contract specifications as "special provisions" and by reference, the State's standard specifications as set forth in Publication 408/2016-IE-Specifications ("Pub 408 Specs").

   a.   Section 1079 of the Pub. 408 Specs required Brayman and SRB to conduct the work in strict accordance with the Contractor's Environmental Compliance Plan and Federal, state, and local regulations governing the protection of the environment, including state regulations that require all reasonable actions be taken to prevent particulate matter from becoming airborne.

   b.   Special Provision 9073 of the Contract required Brayman and SRB to ensure that all project waste is properly collected, handled, stored, classified, transported, and disposed of in accordance with EPA and Pennsylvania DEP regulations.

   c.   Special Provision 9075 of the Contract required Brayman and SRB to install and use containment systems for a variety of different types of paint removal methods.  Containment systems are required when specified by the Department in order to control, below harmful levels, exposures of dust, lead, and other toxic metals that may be present in the paint being removed.

16

d. <u>Special Provision 9077</u> of the Contract required Brayman and SRB to conduct the work in strict accordance with federal, state, and local regulations governing worker protection. All worker protection requirements apply to Contractor and Subcontractor personnel working for the Contractor who are exposed to lead and other toxic metals.

## ANDY WARHOL BRIDGE REHABILITATION PROJECT

56.     Bridges are critical for the daily life of the City of Pittsburgh and the surrounding region.   Hundreds of thousands of commuters travel over one or more bridges to the heart of the city on a daily basis. The 7th Street Bridge, also known as The Andy Warhol Bridge, is one of these critical access links providing ingress and egress to downtown Pittsburgh from the Northshore.   In addition to vehicular and pedestrian traffic, the bridge also serves as a conduit for vital utilities servicing the area.

**Bridge Corrosion**

57.     Because structural steel will corrode if left unprotected or inadequately protected from the natural environment, corrosion can threaten the long-term function and integrity of a steel bridge.

58.     Existing steel bridges in the Pittsburgh area, including the 7th Street Andy Warhol Bridge, are aging and reaching a critical level of deterioration. As the government agency responsible for bridge maintenance, Allegheny County faces cost and logistical challenges associated with corrosion protection, including the health, safety and environmental concerns arising out of use of lead-containing paints used to coat most of these bridges.

59.    These challenges are addressed and reflected in the bidding Specifications incorporated into the contract terms for the 7th Street Rehabilitation Contract, which are material terms of the contract.

**The Contract**

60.    This action involves allegations of fraud in the rehabilitation of the 7th Street Bridge (more commonly known as The Andy Warhol Bridge) ("the Project") in Pittsburgh, Pennsylvania. The rehabilitation Project involved extensive construction work that included a new concrete deck, structural steel repairs, upgrades to the bridge's draining system, and painting that included the removal of lead paint that was overcoated but not removed during the previous paint job.

61.    The Project was estimated to cost $25,391,749.45 and was implemented as joint project between Pennsylvania Department of Transportation (PennDOT) and Allegheny County.    The United States Department of Transportation contributed $20,313,399.52, PennDOT contributed $3,808,762,41, and Allegheny County contributed $1,269,587.47.

62.    On May 5, 2016, the project was advertised for bidding. The bids were opened via PennDOT's ECMS System on Thursday, June 9, 2016 and Allegheny County awarded Defendant Brayman the 7th Street Bridge Rehabilitation Project, County Project No. AL-03-0801, being the lowest bidder complying with the requirements as set forth in the project manual. That was followed by the PA Department of Transportation concurrence of that award on July 13, 2016.

63.    The contract number is 88451 and is dated July 27, 2016. Under the contract, Brayman was to receive $25,391,749.45, which included a subcontract in the amount of $8,830,000 to SRB for painting.

64.    Defendant Brayman's website describes the Andy Warhol (7th Street) Bridge project as:

> Rehabilitation consists of complete removal and replacement of the concrete deck, extensive beam and structural steel repairs to be performed by our sister company Advantage Steel & Construction, a complete paint job and other miscellaneous construction and repairs.

## FRAUDULENT CONDUCT LEADING TO THE SUBMISSION OF FALSE CLAIMS AND WORK THAT DID NOT MEET THE CONTRACT REQUIREMENTS

65.    There are multiple but interrelated schemes of fraudulent conduct that led to the submission of false claims to the government by SRB and Brayman. Each of those schemes, described below, involved illegal ways to avoid or reduce SRB's costs, giving it an unfair advantage and allowing it to underbid its competitors to obtain the painting subcontract from Brayman. With SRB's lower bid in hand, Brayman had an unfair advantage, allowing it to underbid its competitors to obtain the prime contract for the 7th Street Bridge Rehabilitation project.

### Davis Bacon Violations/Misclassifications

66.    The first scheme involved SRB's intentional and methodical misclassification of its workers and under payment of wages in violation of the Davis Bacon Act. The payment of a "prevailing wage" is required by the Davis Bacon and Related Acts ("Davis Bacon"), 40 U.S.C. §§ 3141-3148, to be included in all contracts

with contractors and subcontractors performing work on Federal or District of Columbia construction contracts or federally assisted contracts in excess of $2,000.

67.     During the period of the contract, the Davis-Bacon wage rate for painters was $33.68 and fringe benefits of $17.35. The Department of Labor, Wage and Hour Decision No. PAIN0057-014, effective June 1, 2016 declared that the hourly rate for painters working on bridge in the Pennsylvania counties of Allegheny, Fayette, Green and Washington would be $33.68 per hour with Fringes $17.35. These figures are set forth in the Department of Labor wage determinations for the applicable time period.  In this case, the contract with Allegheny County specified that the painters on the project were to be paid a prevailing wage of $33.68 and fringe benefits of $17.35.

68.     In addition to the requirement to pay prevailing wages to its employees, contractors and subcontractors must certify in writing to the Government that they are providing correct and complete payroll information, "payroll certifications." These weekly certifications must identify all laborers at the contract worksite and affirm that all such laborers are paid the requisite Prevailing Wages. 40 U.S.C. §§ 3145; 29 C.F.R. § 5.5(a)(3)(i) & (ii)(A)-(B). 48 C.F.R. § 52.222-8.   Falsification of any of the above certifications can subject a contractor or subcontractor to civil prosecution under the False Claims Act. 29 C.F.R. § 5.5(a)(3)(ii)(D).

69.     Relators' investigation of SBR's bidding and payroll practices on the project revealed that in order for SRB to gain a bidding advantage, SRB manipulated the number of workers it planned to assign to each work classification established by DOL by intentionally allocating workers to the lower-wage laborers classification(s) even though they knew that many of these workers were performing painters' work and if properly

20

classified would have received a higher wage rate. Misrepresentations related to wages and laborers' classifications, and other questionable expense items, allowed SRB to underestimate its labor costs and underbid competitors in order to win the contract.

70. Further, Relators' investigation revealed that after SBR was awarded the contract, it continued to misclassify a significant number of its workers on the project for the purpose of paying these workers at a lower wage and fringe benefit than required. SRB also submitted fraudulent payroll records with false certifications to government agencies.

71. The misclassification and related Davis Bacon issues were flagged at a project meeting on September 12, 2016. Chris Geronimos, attended that meeting on behalf of IUPAT57 to raise numerous concerns relating to SRB's performance and compliance as the painting subcontractor under the Brayman contract. Also in attendance were representatives from Allegheny County, its consultant, Hill International and Luke Pappas, President of SRB. At that meeting, Mr. Pappas acknowledged and confirmed SRB's obligations to pay at the correct rate and committed to filing appropriate certified payroll certifications on a timely basis. Pappas also assured the County that SRB was committed to meeting the contract requirements to use the specified number of CAS certified workers (see discussion below). Thus, SRB's conduct described herein is "knowing" under the FCA.

72. Notwithstanding Mr. Pappas's express assurances, and despite the unambiguous statutory mandates of Davis Bacon and the requirements specified in the contract documents, SRB failed to pay many of the workers the required prevailing wage.

73.     An investigation by the U.S. Department of Labor (DOL) determined that SRB had misclassified its workers for the period from August 28, 2016 through March 5, 2017, the first seven months of the contract.  The DOL investigation was based upon SRB's certified payroll documents and an analysis by IUPAT57 that were provided to the DOL Wage & Hour Office by Thomas Flook, a field representative for Relator IUPAT57. In its letter dated August 15, 2017, the Department of Labor Wage and Hour Division found that SRB had misclassified 25 painters as laborers, in violation of Davis-Bacon Related Acts and the Contract Work Hours and Safety Standards Act.  It directed SRB to pay $82,839.40 in back wages and to confirm future compliance to pay the correct Prevailing Wage. See Exhibit 1.

**Failure to Have Sufficient Workers with Required CAS Certifications**

74.     The second scheme involved the use of workers that were not properly certified as painters as required by the terms of the Contract.

75.     Special Provision a35648 of the 7th Street Bridge Contract (Notice to Contractor – Painting Contractor Certification) required that any painting contractors engaged in surface preparation and coating application work, (1) shall maintain a minimum ratio of certified craft workers of 50%, and (2) shall be certified by a recognized Certification Agency as adhering to a Contractor Quality Management Program.  These minimum standards for painting contractors, were included, to insure the elevated safety, quality and environmental standards that are required for that certification.

76.     Defendants SRB and Brayman were aware of the above referenced Coating Application Specialist (CAS) certification requirements from the original bid specification published on May 5, 2016 and again at the time of signing the contract.

22

Defendants were further aware of the need for its painting subcontractor to "…maintain said certifications for the duration of the project."

77.     The Specifications further stated that "Craft workers who do not possess a current and valid certification …. Shall not be allowed to perform work on the project." And "…the Owner shall be notified of any change in craft worker certification status."

78.     As with the Davis Bacon issues discussed above, noncompliance with CAS requirements was raised as a concern as early as the September 12, 2016 meeting between Allegheny County, SRB, Hill International and IUPAT57.  Mr. Geronimos of IUPAT57 noted that many SRB workers were not CAS certified, as required by the Contract Special Provision a35648.

79.     All parties present, including Mr. Pappas, President of SRB, acknowledged the requirements for CAS certification of SRB's workers.  Hill confirmed the contract required that 50% of SRB's crew be CAS certified and that 100% of its workers performing surface preparation or painting be certified: 75% at Level II and 25% at level I.

80.     The CAS certification levels are described as follows:

    a. <u>CAS Level I</u>: Basic Level I qualification is intended for entry-level/trainee Application Specialists. Level 1 Application Specialists customarily work with and under the supervision of Level 2 and Level 3 Application Specialists. Certification is based on 1) Successful completion of a skills assessment program (administered by the contractor or its designee) measuring essential employability skills: basic reading, writing and arithmetic, document use, and numeracy

evaluated in the language of the workplace, and 2) Successful completion of an SSPC-administered written examination on good painting practices.

b. <u>CAS Level II</u>: The SSPC Coating Applicator Specialist Level 2 Certification Program requires passing a closed-book written exam drawn from the core areas of the SSPC ACS-1/NACE 13 Standard Body of Knowledge of Environmental, Safety, and Health; Surface Preparation; Coating Application; and Equipment/Troubleshooting. The hands-on portion of the testing certifies proficiency in abrasive blasting and coating application using conventional or airless spray.

81. At the September 12, 2016 meeting, SRB reaffirmed its commitment to abide by these contract requirements.[1]

82. Subsequent to the September 12, 2016 meeting, Plaintiffs/Relators' investigation and analysis of the certified payroll records, interview notes from the City of Pittsburgh Controller's Office, and the SSPC CAS 2 certification log revealed that 35 of 59 (59%) workers on the project were **not** CAS certified and 15 of the 34 (44%) workers classified as blaster/painters were **not** CAS certified. A redacted copy of Relators' analysis is attached as Exhibit 2 to this Complaint. An unredacted copy has been provided to the Government and an unredacted copy will be provided to Defendants when the seal is lifted and the summons and complaint served.

---

[1] It should be noted that it was only after Geronimos raised the issue at the September 12, 2016 meeting that SRB obtained certifications for certain workers.

83.    Defendants failure to have the required CAS certifications for workers on the 7th Street Bridge project knowingly violated the contract requirements.  Work on the 7th Street Bridge was performed by workers without the required certifications.

**Failure to Comply with I-9 Form Eligibility Verification, IRCA and False Verifications and Certifications of Undocumented Unauthorized Workers**

84.    The third scheme involved the use of unauthorized workers in violation of U.S. immigration laws.  Recognizing that employment is often the magnet that attracts individuals to reside in the United States illegally, Congress passed the Immigration Reform and Control Act of 1986 ("IRCA"), making it a federal crime to hire unauthorized workers or illegal aliens.  See, § 101(a)(1), 100 Stat. 3360, 8 U.S.C. § 1324(a). Under U.S. law, employers cannot hire individuals who they know are not authorized to work in the United States.

85.    The sanctions provisions mandate that employers must identify the identity and employment authorization of each person that they hire and complete and retain a Form I-9, Employment Eligibility Verification, for each employee.

86.    E-Verify is a federal program by which subscribing employers can seek verification of employment authorization of new employees from the Department of Homeland Security (DHS) and the Social Security Administration (SSA).  E-Verify checks the Social Security and DHS data bases to confirm/verify that the information provided by the employee is accurate and that the person is authorized to work. E-Verify was designed to ensure that new hires are authorized to be employed and are not undocumented aliens.

87.    Typically, E-Verify will provide an immediate confirmation of work

authorization. In those cases where a "tentative non-confirmation" results, the employer is required to resolve the issue within a prescribed time period. Failure to resolve, or resolving with a non-confirmation precludes further employment, since engaging a new hire under these circumstances would presumptively result in a knowing violation of the immigration law.

88.    Contractors with a federal contract that contains a FAR E-Verify clause are mandated to use E-Verify for their new hires and all employees (existing and new) assigned to the contract.

89.    The Commonwealth of Pennsylvania passed the Public Works Employment Verification Act, effective January 1, 2013, mandating every public works contractor and subcontractor to utilize the federal E-Verify Program. 43 P.S. §§ 167.1, *et seq.*

90.    Allegheny County has its own e-verification ordinance for county contracts and county subsidized projects that prohibits contractors from knowingly employing or contracting with unauthorized aliens to perform work and requires a certification of compliance and participation in the aforesaid jointly administered state and federal E-Verify Programs.

91.    The contract for the 7th Street Bridge Rehabilitation Project required both Brayman and SRB to utilize the federal E-Verify Program pursuant to county, state and federal law. See Section 107.31 of Pub 480 Specs incorporated into the Contract. Both companies executed verifications, Brayman on June 9th, 2016, and SRB on August 15, 2016, certifying that each was in compliance, and further agreeing to prospectively to

26

verify employment eligibility of each new hire within 5 days of the start date. See Exhibits 3 and 4, attached.

92.    SRB knew at the time of the bidding that it would employ undocumented/unauthorized aliens to work on the projects, which allowed it to submit attractive, but unrealistic, low bids to undercut its competitors.

93.    As discussed herein, Relators' investigation and analysis of the certified payrolls and interviews conducted by the City of Pittsburgh Controller's Office, revealed discrepancies in the social security numbers of certain employees which led to an expanded audit by Allegheny County that determined SRB had failed to comply with E-verify requirements in materials respects, including: "…that the E-Verify process was not timely generated for all 60 employees on the Project within 5 days after initial hire."

94.    The investigation also revealed that "no E-verify results were provided for 41 out of 60 SRB employees on the Project, representing 68.33% of total number of SRB employees with submitted form I-9's." See Allegheny County letter dated, April 19, 2017, attached as Exhibit 5.

95.    In addition to reviewing the Defendants e-verify compliance, the County audit involved the review of Form I-9s for each of the employees that had worked on the 7th Street Bridge Rehabilitation Project.

96.    As noted in the County's April 19, 2017 letter: "…Many of the Form I-9s that were produced by SRB contained incomplete information, were illegible, lacked employee signatures and were not dated."

97.    Section 1 of the Form I-9 must be completed and signed by the employee no later than the first day of employment and must provide personal identifying

27

information such as name address, birth date and U.S. Social security Number and an attestation of citizenship or immigration status.

98.     Within three business days of starting work, employees must present documentation of identity and work authorization.  Section 2 of the Form I-9 requires the employer to review the information provided by the employee in Section 1 and is completed by examining evidence of identity and work authorization within three business days of the employee's first day of work.

99.     By signing Section 2, the employer or its authorized representative is attesting under penalty of perjury (28 U.S.C.  §1746) that he has physically examined the documents presented by the employee, the document(s) reasonably appear to be genuine and to relate to the employee named, that to the best of his knowledge the employee is authorized to work in the United States, the information that was entered in Section 2 is complete, true and correct to the best of his knowledge, and that he is aware that he may face severe penalties provided by law and may be subject to criminal prosecution for knowingly and willfully making false statements or knowingly accepting false documentation when completing the form.

100.     Incomplete or inaccurate E-verify and I-9 documents constitute false records or statements created by SRB in an attempt to fraudulently subvert or circumvent the E-verify requirement and process.

101.     Compliance with the E-verify system was a contractual requirement material to Brayman and SRB's ability to receive payment under the contract.

102.    As a result of the above findings, Allegheny County instituted an onsite verification process which required each SRB employee to provide evidence of employment eligibility before entering the job site.

103.    On the date that the employees were to appear with documentation to prove their eligibility to work, many of the workers previously working on the job did not appear.

104.    On May 15, 2017, Relator Kress contacted the Department of Homeland Security ("DHS") to report that SRB had failed to properly utilize E-Verify and that the Form I-9s submitted to the County were grossly deficient.  He requested that DHS intervene and conduct a Form I-9 audit of the SRB workers on the 7th Street Bridge Project.

105.    On July 14, 2017, Relator Kress returned to the same DHS office to provide follow-up information, and on August 4, 2018, Mr. Kress and a representative of IUPAT57 met with special agents for DHS at the IUPAT57's union hall to further discuss the SRB's violations of immigration laws.

**Violations of OSHA and other Health and Safety Laws**

106.    The fourth scheme involved violations of health and safety standards that placed workers and the community at large at risk.  Those health and safety standards are reflected in the special provisions of the Contract and in specifications set forth in Publication 408/2016-IE-Specifications that were incorporated by reference into the 7th Street Bridge Project contract.

107.    Defendants repeatedly and regularly violated 29 CFR 1910.134 by failing to provide respirator protection to workers working in conditions that created hazardous

dust, thereby recklessly exposing workers to hazardous material (i.e. lead paint dust). Exhibits 6 and 7 show workers on the bridge project on May 15, 2017 working in hazardous conditions without respirators.

108.    Defendants repeatedly and regularly violated 29 CFR 1926.453 by failing to implement and enforce safe procedures for utilizing aerial lifts.  In particular, Defendants allowed employees to sit and climb on the edge of aerial baskets and engage in other safety violations using planks, ladders and other prohibited devices. Exhibit 8 shows workers perched on the railing and not on the floor of the basket while working on the bridge on May 2, 2017.

109.    Defendants repeatedly and regularly violated 29 CFR 1926.501 by failing to provide proper fall protection.  In particular, Defendants failed to provide guardrail systems, safety-net systems or other personal fall arrest systems for workers working more than 6 feet above a lower level.  Exhibit 9 shows workers working atop the bridge outside a basket without proper fall protection on May 2, 2017.

110.    Defendants repeatedly and regularly violated Special Provision 9073.2 of the Contract which provides for the proper handling of hazardous waste materials.  In particular, contractors are prohibited from placing hazardous waste on unprotected ground.  Further, waste must be located in a secure area with identifying signage, adequately shielded from wind and collected at the end of each work day and stored in storage drums so that no waste is left exposed overnight.  Exhibits 10, 11 and 12 show that on April 25, 2017 Defendants placed tarps and uncapped hoses containing lead paint dust on unprotected ground, open to the public, and unshielded from wind and water dispersion.

111.    In addition. Defendants violated Special Provision 9073.2 of the Contract by failing to use to appropriately sized, rust and corrosion resistant containers for hazardous waste.  Such containers must have tight fitting lids and covers which are water resistant and leak proof to adequately protect against water and wind dispersion. Roll-off containers exceeding capacity are prohibited.  Improper waste storage is grounds for immediate project shutdown. Exhibits 13, 14. 15, and 16 show that Defendants improperly stored waste during the project thereby subjecting workers and the public to hazardous waste exposures.

112.    Defendants repeatedly and regularly violated Special Provision 9075.3 of the Contract by failing to design and use a containment system that was capable of controlling project emissions (release into the air, water or ground) for the protection of the public and the environment.  Exhibits 17, 18 and 19 show that on April 25, 2017 and June 13, 2017 large gaps in the overlap of containment pans allowed dust and debris to escape from the Defendants' containment system.

113.    Defendants repeatedly and regularly violated Special Provision 9077.3 of the Contract by failing to use PPE and hygiene facilities that are free of loose dust and debris and to properly dispose of all hygiene water, cleaning materials and PPE that cannot be cleaned for reuse.  Exhibit 20 shows that on May 17, 2017 that water from the Defendants' wash trailer for workers exposed to lead paint dust, and hazardous water from the project site was discharged into the storm sewer.

114.    Defendants also repeatedly and regularly violated Special Provision 9077.3 of the Contract by failing to abide by proper housekeeping procedures to confine exposures to hazardous materials and prevent contamination beyond the worksite.  In

31

particular. Defendants allowed SRB employees to leave the jobsite without washing, showering or segregating contaminated work clothing, thereby allowing workers to track hazardous material to offsite locations (i.e. motels where out-of-town workers were staying).

115.    Defendants also repeatedly and regularly violated Special Provision 9077.3 of the Contract by failing to properly define and establish regulated work zones by erecting barriers and posting signs to limit access to hazardous areas by unprotected and untrained personnel or the public.  Exhibits 21 and 22 shows a pedestrian walkway with joggers (and stroller) passing by a chain-link fence.  On the other side of the fence, workers are engaged in grinding activities without using any method of dust control.

116.    Defendants repeatedly and regularly violated Section 1079.3 of Pub 408 Specs by failing to prevent particulate matter from becoming airborne and failing to conduct inspections and take other action to prevent releases of hazardous dust and debris to the soil, water, sediment or storm sewers. Exhibits 23, and 24 show that on June 13, 2017 and May 17, 2017 particulate matter from the bridge grinding and painting became airborne and was deposited on the soil near the bridge.

**Violations of Quality Standards**

117.    The fifth scheme involved chronic violations of basic quality standards that go to the heart of SRB's bridge painting subcontract.  As further detailed below, they include and/or resulted in: failure to apply proper stripe coat; improper surface preparation; improper coating thickness; runs, sags and holidays; improper touch-ups; rust bleed through; and other application deficiencies.

32

118.    Pursuant to the terms of the Contract, and the specifications in Publication 480, SRB was required to meet the standards for a "QP-1" painting contractor. These standards apply to all activities associated with coating work on government contracts that are subject to applicable Federal (OSHA), EPA, State and local safety regulations and SSPC-PA Guide 3 ("A Guide to Safety in Paint Application").

119.    To ensure proper paint film build, SRB was required to stripe coat all corners, crevices, rivets, nuts, bolts, welds and sharp edges. The stripe coat must be applied by brush before applying a full coat and must extend one inch from the edge it is protecting. Sec. 6.1 of Volume 4 of the SSPC Good Practice Painting Book; PA-1 Sec. 7.3; Sec. 1070.3(d)4 of Publication 408. SRB failed to properly stripe coat nuts and bolts, increasing the risk that the paint will fail prematurely.

120.    SRB was required to apply the three-coat system to the dry film thicknesses in in such a manner to "achieve a surface that is free of shadow-through, runs, sags, overspray, dryspray, pinholes, skips, misses and other film discontinuities." Publication 408 Sec. 1070.3(d)5; PA-1 Sec. 7.5; See SSPC Good Painting Practices Volume 4 Chapter12. SRB failed to apply the coating using a proper thickness, resulting in sags, runs, curtains, holidays and other similar defects.

121.    Non-uniform coating with variable thickness also results in unsightly glossy areas also known as "hot spots."

122.    SRB was required to immediately repair incorrect thickness applications and other related defects. According to Publication 408 Sec. 1070.3(d)6, a paint coat is defective if : a) if it is damaged; b) it lifts, blisters, or wrinkles; c) it has excessive runs or sags; d) it shows evidence of application under unfavorable conditions; e) it does not meet

33

coating thickness and continuity requirements specified in Section 1070.3(d)5; f) rusting occurs; g) the workmanship is poor; or h) impure or unauthorized paint has been used.

123.    SRB failed to timely repair a variety of defects in the paint application as follows:

a.  Surfaces where improperly prepared in areas where the primer coat had peeled but was not repaired before the topcoat was applied;

b.  Rust was not removed and allowed to bleed through to the finish coat;

c.  Surfaces were defectively touched-up in areas where the surfaces were not sanded and properly feathered in;

d.  Areas were left where runs were sanded but not touched up;

e.  Touch-ups were done improperly leaving a flat and non-uniform in appearance.

## FALSE STATEMENTS, CLAIMS AND CERTIFICATIONS

124.    In order to assure high quality and durable construction in conformity with approved plans and specifications and a high degree of reliability on statements and representations made by engineers, contractors, suppliers and workers on Federal-aid highway projects, Section 1020 of Title 18 of the United States Code makes it unlawful to knowingly make:

"…any false statement, false representation, false report or false claim with respect to the character, quality, quantity, or cost of any work performed or to be performed, or materials furnished or to be furnished, in connection with the construction of any highway or related project approved by the Secretary of Transportation."

125. The false statements or certifications, implied or express, identified herein are violations of 18 U.S.C. § 1020 and also serve as a basis for FCA claims under 31 U.S.C. § 3729 *et seq.*

126. As stated above, Defendants' fraudulent scheme involved submission of claims that contained both implied and express false certifications.

**Express False Certification**

127. Both SRB and Brayman made express false certifications to various government programs in connection with the 7th Street Bridge Rehabilitation project. First, both Defendants submitted Public Works Employment Verification forms before work began on the project. By submitting that form, each defendant specifically affirmed that it was in compliance with the Public Works Verification Act and that it utilized the federal e-Verification Program (EVP) and that all of its employees were authorized to work in the United States. The companies also agreed to maintain compliance with the Act throughout the duration of the contract.

128. As discussed above, SRB was not in compliance with the Act on the date the verification was signed on August 15, 2016 and submitted, and was not in compliance thereafter, rendering its certifications false. Likewise, the verification signed and submitted by Brayman on June 9, 2016, was false since it did not comply with its obligation to ensure compliance of SRB throughout the duration of its contract. See Exhibits 3 & 4.

129. A second express false certification is found in the payroll certifications

that SRB submitted weekly during the course of the contract. Scores of certifications falsely represented that the wages paid and the rates are not less than required by the contract and the job classifications are correct. Specifically, the certification states....

> "(2) That any payrolls otherwise under this contract required to be submitted for the above period are correct and complete; that the wage rates for laborers or mechanics contained therein are not less than the applicable wage rates contained in any wage determination incorporated into the contract; that the classifications set forth therein for each laborer of mechanic conform with the work he performs."

130.    As discussed above, the Department of Labor determined that numerous SRB employees were misclassified and those employees were paid less than required under the contract, rendering the payroll certifications false. This investigation and determination was based on information initially provided by Relators.

131.    A third express false certification is found in the I-9 forms that SRB submitted to Allegheny County to certify that its workers were authorized to work in the United States. Each I-9 form contains a statement by SRB, through its representative Lucas Pappas, that he had examined the documentation presented by the named employee, that the documents appeared to be genuine and related to the employee named and that to the best of his knowledge the employee was authorized to work in the United States.

132.    As discussed above, Allegheny County audited the Form I-9s submitted by SRB and found them to be grossly deficient. "Many of the Form I-9s that were produced by SRB contained incomplete information, were often illegible, lacked employee signatures and were not dated." These Form I-9s that were submitted in such an incomplete manner, contrary to federal law, to conceal the unauthorized status of SRBs

36

work crew, rendering the certifications false. The forms themselves also constitute false records or statements material to a false claim.

## Implied False Certifications

133.    In *Universal Health Services v. United States, 136 S.Ct. 1989 (2016)*, the Supreme Court recognized that an implied certification can be the basis of an FCA action. Under the 'implied certification' theory of FCA liability, a person can be liable for making fraudulent misrepresentations to the government when that person "'makes representations in submitting a claim but omits its violation of statutory, regulatory, or contractual requirements,' rendering those representations 'misleading with respect to the goods or services provided.'"

134.    In this case, Defendants have knowingly made claims for payment of Federal funds from a federal agency without disclosing numerous violations of regulations and laws that affect their eligibility for payment. Specifically, as stated above, Defendants repeatedly violated the Davis Bacon prevailing wage law, the Immigration Reform and Control Act, OSHA and various environmental laws and regulations that protect workers and the environment. Additionally, Defendants failed to meet various quality standards required by the contract and regulations. Defendants' failure to disclose their noncompliance with the above statutory, regulatory and contractual requirements makes any representations about the goods and services misleading half-truths. They are material because they bear on the very essence of the contract for rehabilitation of the 7th Street Bridge. Had the federal government been aware of the pervasive noncompliance it would not have awarded the contract to the Defendants, nor would it have authorized payments.

## Submission of claims

37

135.    As set forth in Exhibit 25, Defendant Brayman presented invoices to Allegheny County and was paid as follows:

| Voucher Doc. Number | Check/ Item Date | Amount Paid |
|---|---|---|
| No.   4102288 | 11/01/2016 | $   857,175.00 |
| No.   4140147 | 12/06/2016 | $1,912,400.00 |
| No.   4177019 | 01/31/2017 | $2,427,806.54 |
| No.   4177363 | 01/31/2017 | $1,913,672.66 |
| No.   4194527 | 02/21/2017 | $1,177,302.85 |
| No.   4218783 | 03/30/2017 | $   371,206.55 |
| No.   4241530 | 04/25/2017 | $   140,436.40 |
| No.   4241532 | 04/25/2017 | $1,019,722.89 |
| No.   4270481 | 05/25/2017 | $1,487.232.30 |
| No.   4297952 | 06/22/2017 | $   626,189.04 |
| No.   4327426 | 08/08/2017 | $   897,764.40 |
| No.   4351714 | 09/19/2017 | $   713,112.00 |
| No.   4367140 | 09/28/2017 | $   153,652.77 |
| No.   4367155 | 09/28/2017 | $2,485,319.95 |
| No.   4417766 | 12/05/2017 | $   590,291.96 |
| No.   4417773 | 12/05/2017 | $   616,915.65 |
| No.   4432933 | 12/21/2017 | $     33,099.84 |

136.    Defendant Brayman submitted 17 voucher documents for payment and was paid a total of $25,526,368.34, which included $8,830,000 which Brayman disbursed to SRB as per its subcontract.

137.    In submitting such vouchers for payment, Brayman repeatedly expressly certified that it had fully complied with the conditions of the contract.

138.    In submitting such vouchers for payment, Brayman repeatedly impliedly certified that it had fully complied with the conditions of the contract and was otherwise entitled to payment.

139.   Defendant Brayman's express and implied certifications were false records and statements that were material to the Defendants' claims for payment, insofar as the Defendants work was not in compliance with the conditions of the contract and Defendants were not entitled to be paid.

140.   Defendants knew that the certifications were materially false, they acted in deliberate ignorance of the truth or falsity of the information or they acted in reckless disregard for the truth or falsity of the information.

## **DAMAGES**

141.   Due to Defendants' significant non-compliance with the material contract specifications and false claims set forth above, the United States, the Commonwealth of Pennsylvania and Allegheny County did not get the benefit of the bargain they made with Defendant Brayman for rehabilitation of the 7th Street Bridge in exchange for $25,391,749.45.  The Governmental entities would not have made the progress payments they made under the contract if they had known of the material contract violations.

142.   Defendant Brayman fraudulently obtained the entire $25,931,749.45 contract from the Governmental entities by utilizing the $8,830,000 subcontract bid from SRB to underbid other contractors who were not utilizing undocumented and unqualified workers to perform the blasting and coating of the bridge and who were not violating health and safety and environmental regulations and who were not ignoring quality standards.  Brayman would not have been awarded the contract had the Governmental entities known that the low bid was based upon use of undocumented and unqualified workers and other fraudulent conduct by the Defendants.

143.    Due to Defendants' significant non-compliance with the material contract specifications and false claims set forth above, the United States, the Commonwealth of Pennsylvania and Allegheny County did not get the benefit of the bargain they made with Defendant Brayman and SRB for the $8,830,000 of services for blasting, lead remediation, priming, painting and finish coating the 7th Street Bridge.  The Governmental entities would not have made the progress payments they made under the contract if they had known of the material contract violations.

144.    Additionally, due to Defendants' significant non-compliance with the material contract specifications set forth above, nearly every portion of the 7th Street Bridge will need to be inspected, measured and remediated to prevent further rusting, corrosion and damage to this critical piece of infrastructure.

145.    Defendants have further damaged the governmental entities in that they have contaminated the soil around the bridge and in the lay down yard with lead and other hazardous materials.  The governmental entities will be caused to expend significant financial resources to test and remediate the soil around the bridge and in the lay down yard.

146.    The United States, the Commonwealth of Pennsylvania and Allegheny County have been otherwise injured and damaged.

## DEFENDANT SRB HAS ENGAGED IN SIMILAR WRONGFUL CONDUCT IN OTHER JURIDICTIONS

147.   During the course of their investigation of the 7th Street Bridge Project, Relators discovered evidence that SRB was performing bridge painting services in other jurisdictions that involved federal funds. Relators determined that the illegal hiring and regulatory violations identified herein were not unique to SRB's Pittsburgh project. Rather, SRB replicated the same illegal and unethical conduct at other job sites sometimes with some of the same undocumented workers.

**Massachusetts Bridge Projects**

148.   On August 3, 2017, SRB was cited by the Office of the Attorney General for Massachusetts for multiple prevailing wage violations during the period from March 3, 2015 to January 31, 2016 while working on three bridge projects: Gloucester Bridge, Wrentham Five Bridges and Worcester Burns Bridge. SRB was ordered to pay $193,407.28 in restitution and $15,000 in penalties.

149.   On April 7, 2016, SRB was cited by the United States Department of Labor for OSHA violations on the Wrentham Five Bridges work site. Inspections conducted during the period from November 6, 2015 to March 9, 2016 revealed multiple violations and resulted in penalties in excess of $10,000.

150.   Relators have compared certified payroll records for the SRB employees who worked on the Massachusetts bridge projects and who also worked on the 7th Street Bridge Rehabilitation project. Relators determined that at least eight of those workers were not paid the prevailing wage in both jurisdictions.

**New York Bridge Projects**

151.   On September 8, 2017, the Department of Labor for the State of New

York issued a Notice of labor law violations to SRB in connection with a bridge project in Onondaga County, New York. SRB entered into a Stipulation with the Department of Labor on June 12, 2017 in which it acknowledged that it had failed to pay prevailing wages to its employees during the period from April 17, 2016 to October 9, 2016 and agreed to pay restitution, interest and penalty in the amount of $185,310.51.

## COUNT I
### Federal False Claims Act 31 U.S.C. § 3729(a)(1)(A)

152.    Relators re-allege and incorporate by reference the allegations contained in the previous paragraphs of this complaint.

153.    This is a claim for treble damages, civil penalties and attorney's fees, under the Federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.* as amended.

154.    By means of the acts described above, defendants have knowingly presented or caused to be presented false or fraudulent claims for payment to the United States. The United States, unaware of the falsity of the claims made, and in reliance on the accuracy thereof, paid for claims that would otherwise not have been allowed.

155.    By reason of these payments, the United States has been damaged, and continues to be damages, in a substantial amount.

156.    Said claims were presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

## COUNT II
### Federal False Claims Act 31 U.S.C. § 3729(a)(1)(B)

42

157. Relators re-allege and incorporate by reference the allegations contained in the previous paragraphs of this complaint.

158. This is a claim for treble damages, civil penalties and attorney's fees, under the Federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.* as amended.

159. By means of the acts described above, defendants knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim in violation of 31 U.S.C. § 3729(a)(1)(B). The United States, unaware of the falsity of the records and statements, and in reliance on the accuracy thereof, paid for claims that would otherwise not have been allowed.

160. By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount.

161. Said false records or statements were made with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

## PRAYER FOR RELIEF

WHEREFORE, *qui tam* Relators pray for judgment against the Defendants, as follows:

a. That Defendants cease and desist from violating 31 U.S.C. § 3729 et seq.;

b. That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty of not less than $10,781 and not more than $21,563 for each violation of 31 U.S.C. § 3729;

c. That Relators be awarded the maximum amount allowed pursuant to § 3730(d) of the False Claims Act and any relevant state statutes.

d.   That Relators be awarded all costs of this action, including attorneys' fees and expenses; and

e.   That Relators recover such other relief as the Court deems just and proper.

## COUNT III
## Massachusetts False Claims Act

162.   Relators re-allege and incorporate by reference the allegations contained in preceding paragraphs, as though fully set forth herein.

163.   This is a claim for treble damages, civil penalties and attorney's fees, under the Massachusetts False Claims Act, Title II, Ch. 12 § 5B.

164.   By means of the acts described above, Defendant SRB has knowingly presented or caused to be presented false or fraudulent claims for payment to the Commonwealth.   Defendant also knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim in violation of the Massachusetts FCA.  The Commonwealth, unaware of the falsity of the claims made, and in reliance on the accuracy thereof, paid for claims that would otherwise not have been allowed.

165.   By means of the acts described above, Defendant also entered into an agreement, contract or understanding with an official of the commonwealth or a political subdivision thereof, knowing the information contained therein was false.

166.   By reason of these payments, the Commonwealth of Massachusetts has been damaged, and continues to be damaged, in a substantial amount.

167.   Said claims were presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

44

## PRAYER FOR RELIEF

WHEREFORE, *qui tam* Relators pray for judgment against the Defendant, as follows:

a.      That Defendant ceases and desists from violating Title II, Ch.12 § 5B et seq.;

b.      That this Court enter judgment against Defendant SRB in an amount equal to three times the amount of damages the Commonwealth of Massachusetts has sustained because of Defendant's actions, plus a civil penalty of not less than $5,000 and not more than $11,000 adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. No. 101-410 section 5, 104 Stat. 891, note following 28 U.S.C. section 2461, for each violation of Title II, Ch.12 § 5B et seq.;

c.      That Relators be awarded the maximum amount allowed pursuant to Title II, Ch.12 § 5F;

d.      That Relators and the Commonwealth be awarded all costs of this action, including attorneys' fees and expenses pursuant to Title II, Ch.12 § 5F and 5I; and

e.      That Relators recover such other relief as the Court deems just and proper.

## COUNT IV
### New York State False Claims Act

168.    Relators re-allege and incorporate by reference the allegations contained in preceding paragraphs, as though fully set forth herein.

169.    This is a claim for treble damages, civil penalties and attorney's fees, under the New York False Claims Act. New York State Finance Law, Article XIII § 189 *et seq.*

45

170.    By means of the acts described above. Defendant SRB has knowingly presented or caused to be presented false or fraudulent claims for payment to the State of New York.   Defendant also knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim in violation of the New York FCA.  Defendant also knowingly made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the State of New York.  The State of New York, unaware of the falsity of the claims made, and in reliance on the accuracy thereof, paid for claims that would otherwise not have been allowed.

171.    By reason of these payments, the State of New York has been damaged, and continues to be damaged, in a substantial amount.

172.    Said claims were presented with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

## PRAYER FOR RELIEF

WHEREFORE, *qui tam* Relators pray for judgment against the Defendant, as follows:

a.    That Defendant ceases and desists from violating the New York State Finance Law, Article XIII § 189 (a)-(h).

b.    That this Court enter judgment against Defendants in an amount equal to a civil penalty of not less than $5,500 and not more than $11,000 for each violation and three times the amount of all damages, including consequential

46

damages, which the state or local government sustains because of the act of that person. Article XIII § 189(h).

c.     That Relators be awarded the maximum amount allowed pursuant to Article XIII §190;

d.     That Relators and the State and any of its subdivisions be awarded all costs of this action including attorneys' fees and expenses pursuant to Article XIII §190 and;

e.     That Relators recover such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, *qui tam* Relators Kress and IUPAT57 hereby demand a trial by jury.

Respectfully submitted,

Date: February 21, 2019

Andrew M. Stone, Esquire
(PA ID No. 35176)
STONE LAW FIRM
437 Grant Street, Suite 1806
Pittsburgh, PA  15219
Tel: (412) 391-2005

/s/ Don McKenna

Don McKenna, Esquire
(ASB-6494-C66D)
HARE, WYNN, NEWELL &
NEWTON, LLP
The Massey Building, Suite 800
2025 Third Avenue North
Birmingham, AL  35203
Tel: (205) 328-5330